The case is Greacen v. Town of Redington Beach Timothy Weber of Weber Crab & Wien here on behalf of the appellant landowners. Issues before this court involve both state law of customary use and also a federal question as to whether that state law as interpreted and applied by the Florida courts is a background principle of state law such that it would provide an adequate defense to a Fifth Amendment claim. And the reason of the latter issue is because the town's position in this case is that the Florida customary use is not the English common law version but one that was newly created by the Florida Supreme Court in 1974 with elements that differ substantially from the common law elements. And if that is the case, the question then becomes how that could be a background principle of state law under Lucas and they stopped the re-nourishment case. We believe that they didn't announce an entirely new doctrine divorced from the common law. In fact, if you look at the Tona Rama court, they cite to Tiffany on real property in all seven elements of the common law claim. And in fact, when this court in Bundy 1 addressed this case, they quoted that portion of the Florida Supreme Court's opinion citing all seven elements from Tiffany on real property. Can I ask you a question though? Sure. This has already been appealed once in this case and we have law of the case here. Why are we not, whether it's right or wrong, why are we not stuck with what we said the first time this came up, which was that the customary use in Florida is a four-element custom? Well I would submit both your opinion and the Florida Supreme Court's opinion did not intend to erase the other elements. In fact, they were quoted in both opinions. They may have been paraphrased or summarized in these four elements, but the issue of whether a custom is reasonable, that was necessary. The issue of whether it's certain as to the place was necessary or as to the person was necessary for a custom at common law. And so the two issues are, if this was winnowed down or watered down to something that didn't require those elements, how is that a background principle of Florida law? This court never considered the federal question in the first appeal because Judge Moody never considered the federal question in the first appeal. This court faulted Judge Moody for weighing the evidence under the state law standard and reversed the summary judgment in favor of my clients, but never reached the issue of whether a formulation of customary use that doesn't include all the common law elements could be a background principle of Florida law or could stand in light of the Fifth Amendment with Florida's particular receiving statute. It seems like we were pretty clear in our prior case. We weren't just summarizing. We say the town may establish customary use by showing that the general area of the beaches has been subject to customary use that is ancient, reasonable, without interpretation, and free from dispute. And I understand that Your Honor quoted that directly from Tona Rayma, and that's what I'm quoting from our case. Correct, Your Honor, and that came from the Supreme Court decision in Tona Rayma, and Tona Rayma discusses specifically the particularity, and in that case, they were dealing with a particular piece of property of 15,000 square feet, and they said particular piece of property. And then the Trepannier Court ... Yeah, but didn't we say in our prior case that Florida courts do not suggest that the local government must prove customary use of property owners' specific parcels of property? I would submit to this court that no Florida case, and I don't think this court intended to permit a finding of customary use where there was no evidence of a specific use of the plaintiff's properties. And in this case, the town has five beach accesses laterally to the Gulf of Mexico and two public parks. The people use those seven ways to come onto the beach and to go where they are permitted to go as of right, and several of these are 50, 80 feet wide, 25 feet wide, so the people come through the accesses and they go where they're entitled to go, and I don't think you can say evidence of people going where they're entitled to go, either below mean high water or at a public place, can substitute for evidence of actual use of the plaintiff's private properties which have been platted, recorded in the town from the commencement of the town. And here, many of these people derived their properties from the exact same plats. And so we have a situation where three of my clients are at least four or five properties north of the closest access. No one came in and testified to the use of those properties, and if general area can be substituted for proof of the plaintiff's actual property, then I think that this doctrine swallows up any notion of private property around the coastline. It seemed to me that I read very different factual stories between your brief and the red brief. It seemed to me that there was significant evidence of large-scale use of this entire stretch of beach by joggers, bikers, people having various strolls, parties, right? I don't, you know, the district court could have weighed that evidence differently perhaps, but why don't we have enough evidence to conclude that, in fact, all of the properties, the evidence shows that all of the properties along this part of beach have been used in the past in this manner? Well, I think the problem is the way the town presented the case. They never wanted to prove certainty as to place or person. And so they came in and they tried to show that the residents of the town and their invited guests had used this area and they used the word beach. And so the word beach is not very descriptive when half of the area out there is public and they have the right to use it as of right. And so trying to distinguish between a witness saying, I went to the beach and I did all these things, were you on private property or public property, I don't know. Well, of course, I mean, it's not as if the plots are mapped out on a beach with flags, right? And I mean, is the suggestion that no one ever went for a walk on the beach at high tide when they couldn't possibly have been below the mean high water mark? And so I think when you look at the evidence the town presented, many of their witnesses, well over a third of their witnesses says, you know, I just didn't feel comfortable going more than halfway up the beach or partway up the beach. I didn't go up there near the seawalls and the private homes. It kind of felt weird to be right behind somebody's private home. But the town's ordinance says 15 feet from the habitable structure is the buffer that the homeowners have. And this is their homestead. This is their castle, the place that they're supposed to have despotic dominion over. And here the town passes an ordinance that not only do the people have the right to go all the way up to 15 feet from the house, but in addition to that, it authorizes government agents to perform all these lawful duties in any of this area. Maybe I missed something, but I don't remember the argument that, if anything, the distance should be further. What I remember is seeing the suggestion that people thought that the seawall was probably where they shouldn't go. Can you tell me where you all made the argument that the 15 feet was itself unreasonable separately from the lower barrier? Our contention was people use the beach how people use the beach, and that's normally down closer to the water, okay? There's a depth to this beach, and yes, people use the beach down. But by conceding that people use the beach and that there's evidence of people using the beach, whether it's closer to the water or not, as Judge Grant pointed out, you'd have to argue that people never used the beach at high tide in order to be suggesting that there wasn't sufficient evidence to show that people had used the beach above the high tide line. Well, actually, the high tide line, unfortunately, was not a substitute for proof of use of the plaintiff's properties in this case, because Florida is a mean high water, which is a 19-year average of the high tides. Which makes your argument even less compelling. Well, I would disagree, because the town couldn't offer evidence that anyone was ever on plaintiff's private property, because they never established where the line was and where the people went. And so I would submit to the court it was the town's burden, not my burden to come in and prove an exact trespass. It was the town's burden to demonstrate. But the town did have a lot of evidence of people regularly using the beach. People going for walks on the beach. People sunbathing on the beach. People regularly using the beach. And so in order for us to be able to accept that there wasn't evidence of people using the private part of the beach, which is what you're basically arguing, we'd have to also accept that nobody ever passed the mean high tide line. So meaning that nobody ever used the beach when the water was at the mean high tide line. And that just, given how frequently it was used, the evidence going back to 1956 from actual people who had used the beach, the evidence of the town being used as a beach, you know, in 1935, that people would drive on the beach, that, you know, they had to make rules about not driving so that people wouldn't get hit. All of those things, to me, tend to suggest that at some point, it was, you know, at some regular point, people were using the beach above the mean high tide line. Why is that not the case? Well, and that's the problem that the appellants have raised with the burden was shifted at us to disprove that people ever used the beach. They just have to show it by a preponderance of the evidence. Why is that not enough to establish by a preponderance of the evidence? I think that's an issue of state law. And we have asked, and so has two of the amicus, that this case be sent to the Florida Supreme Court to tell us what the burden of proof is on a case like this. What the elements are, what it means to be ancient, what it means to have certainty. Why would it be any more than a preponderance of the evidence? Well, because Florida law presumes against usage rights in another's property. And the Downing v. Byrd case says— But that doesn't have anything to do with the burden of proof. You can presume that it's a private use and still require the government to show by a preponderance of the evidence that it's not in order to rebut that presumption. Well, Downing v. Byrd, Florida Supreme Court says there's a presumption against this usage rights. They're disfavored. And to establish them, you have to establish it by clear and convincing evidence. Now, no court in Florida has ever addressed that for customary use, but that's the law of prescription and dedication in the state of Florida, clear and convincing evidence. And we would submit that it should be applied to custom. Are you suggesting that it is fatal to the Town's case that the Town did not introduce any evidence of where the Mean High Water Line is? We absolutely suggested that to the District Court because it was their burden to show ancient, continuous use of the appellant's property. So there's a lot of witness testimony, as we've talked about already, about people using dry sand, and presumably the District Court saw the dry sand testimony as a proxy for landward of the Mean High Water Line. I'm assuming you dispute that, that that's an adequate proxy. Absolutely. And that's exactly what we argued to the District Court, is you can't take testimony that people put their stuff down in the sand and say that they were on private property. You have to come in and establish, here's the historical Mean High Water Line on this beach. Here's how far it was from the seawalls in 1970. Here's how far it was from the seawalls in 1980 and in 1990. Here's where the people went. Because having witness testimony about dry sand, it could also mean that they were on the public part below the Mean High Water Line, correct? Absolutely. And the evidence that they could very well be on public property was used as a proxy with this general area to say, now we have a custom that the private property owners cannot exclude people from their property. And the general area was not intrapanear about getting close enough. The general area had to do with the distance between the water and the seawall that Ebden flowed with the tide and where the cars were driving in that particular. Can I ask you one question? The one piece of evidence I think that you don't dispute is that for 24 years there was a annual party that was occurring on some of the public beach property that would spill into the neighboring private property. If that were the only testimony available, would that establish customary use of the private property? No, Your Honor, and I think it was a couple of limited occasions. It was in the property immediately north of the town's owned beach park when Zoe Roseman owned that property. She moved, consent was withdrawn, they went down to Mr. Hayward Chapman's property, which was two doors down from beach park and the property next to beach park, and with the specific consent of those upland owners, had it a couple of years. But you're still fighting here against our prior opinion where we say the Florida Doctrine of Customary Use does not impose an adversity requirement. And the doctrine applies even when the owner has given actual or implicit permission, right? And to tag onto that question, to add onto it, you cited downing as an authority for why you would need clear and convincing evidence, but downing involves a different theory of possession and it required an adversity requirement. And as Judge Branch has just pointed out, we said this does not. So when you're answering her question, if you could also explain why the downing burden has any applicability here where there's no adversity requirement. So our argument on custom was custom is by nature consensual. It's acquiesced into over a long period of time. But it could never be something that was optional conduct that was by leave from time to time. That's what the English cases say. And so the evidence of Mr. Chapman granting leave and then withdrawing it, and they never had it there anymore. And now it's been for continuously in town park inland for many, many years before and many, many years after. It's all been inland and not on the beach. So it wasn't continuous. It was done by leave from time to time from two specific landowners or three specific landowners who are directly adjacent to the town's own land, allowing specific uses at a particular time. I find that very hard to imply any longstanding right of use over the rest of the town and particularly the plaintiff's properties that are south of that to the north of that. And so why it's consensual, it can't be the result of an optional conduct that was granted by leave from time to time to be a custom. And that was with reference to the burden. They had the burden of showing something more than just loose and uncertain testimony. I'm asking you specifically about Downing. Why is Downing instructive here when it was speaking to an adversity requirement and there is none here? We have cited Downing only on the portion of our brief as it relates to what is the burden of proof. And it just says in order to establish rights in someone else's property by usage, you should have to do so by clear and convincing evidence. Right, when there's an adverse, when there's an adversity requirement. The court just says all usage rights in someone else's property are disfavored under Florida law and that's why we believe that that burden of proof was adopted by the Florida Supreme Court because this is my client's properties and if you want to establish a usage right, we think the town should have been held to a burden here. And they were not held to any burden other than put people on the stand to give loose and uncertain testimony about going to the beach somewhere in the general area of the town. All right. Thank you very much, Mr. Weber. And you've reserved three minutes. We took you over pretty substantially. So Mr. Eschenfelder, I'm going to add six minutes to your time. Please do not feel like you have to use that time. But if you want it, for fairness, it will be there. Your Honors, thank you. May it please the Court. Robert Eschenfelder with the firm Trastanio. I serve and have served for many years as the town attorney for the town of Reddington Beach. I just wanted to, I guess, start with the factors that we're dealing with. And, you know, from the town's perspective, it's a bit frustrating because the town is being sued for the doctrine of customary use, which the town didn't create. It is a common law doctrine recognized by the Florida Supreme Court many decades earlier. The Florida legislature recognized it, citing the same four factors as the Florida Supreme Court did, ancient, reasonable, without interruption, and free from dispute. What the town did in 2018 was to say, well, we see that the legislature is drafting this statute, and it creates a scheme whereby if we want to protect customary use for our residents in the future, then we're going to have to sue each individual property owner all along. And that's a very cumbersome process. So they adopted the ordinance, and this court in 2021 heard all of that and heard the statute. And I can't recall which judge said that we're dealing with the law of the case, but we are dealing with the law of the case. That opinion was not appealed to the United States Supreme Court. It went back for trial. And so those are the factors that the town and the trial judge felt was to be applied. And so then, turning to the quantum of evidence, you know, the town had 80 witnesses. As I point out in the brief, and as the trial judge's order below indicated, she would not let me have all of those witnesses, and her right to manage the court limited me to 30. But when you look at the transcript, and as some of it quoted in my brief, you know, you will see that people, and these aren't lawyers, these are residents of the town who came in and said, look, I've lived here for 30 years, I grew up here, my grandkids are coming here, here's what happens. And I understand that the owner's counsel wants to muddy the sand, so to speak, by saying, well, you didn't specifically figure out where the Mean High Water Line is. But isn't the Mean High Water Line a very important point? Because dry sand doesn't tell you whether it's private or public at any moment. The Mean High Water Line, anything from that line to the water is public. So if all of your witnesses were saying from the, I have always used the beach from the Mean High Water Line to the water, it doesn't matter, you can have 100,000 witnesses, all they're testifying to is that they are using public property. So why isn't the existence of, and the identity of, the Mean High Water Line critical, and the town's failure to introduce that evidence, and witnesses who testify about that, why isn't that fatal to your case? So I think the biggest point there is that to a person, the owners themselves claimed and complained about the fact, people are using my private property. They're on my private property. So the very complaints that they filed in this case provide evidence to the court. Did the complaints start after you passed this ordinance? The complaints were about the ordinance. So the people, once you passed the ordinance, then they had people at all hours drinking alcohol on their property, correct? Correct. But how is that customary use, if this is something that sprang into being recently because of the passage of the statute? I'm not sure I'm following you on that point. You then marry that up with the testimony of all of the town's residents who say, we were doing that, we have always been doing that. What is that? What is that? I'm sorry. What is that? Going to the beach in the same place that the plaintiffs are complaining that we're in now, we've always gone to those same exact places. Some of the testimony, as opposing counsel talked about, what was up to the seawall. No one contends that the mean high waterline is all the way up to the seawall. So I understand that the mean high waterline wasn't measured, but understand this as well. The mean high waterline, as defined in Florida statutes, and I think it was referred to in this court, is an average of 19 years title. So we're going back, from my testimony, my witnesses, 68 years was the oldest witness who I was able to generate. And so that's several mean high waters. So was I expected to go and take all of those measurements? It changes over time. I think the town's point is, and the lower court made the point, if the use was occurring below the mean high water, it's not even an issue because it's sovereign submerged land. It's open to the people of Florida for all time. So we're only talking about those uses that are occurring on the other side of the mean high waterline. Those uses are fluid. People testified that those uses are fluid. So I'm not here saying, and the town's ordinance doesn't say that all of those uses were above the mean high waterline, but very clearly many of them were. And the testimony is clear that uses occurred at or very near people's seawalls, which is well above where the mean high waterline would be. I imagine that the ordinance was not passed in a vacuum. Am I correct about that? Was the ordinance passed in response to complaints that began to occur? There were two things converging at the same time in 2018. One was the legislature's action in moving this statute that they did. The other was that some of the plaintiffs were new owners, that they had just purchased their homes. They come from out of state. They don't know what the uses of the town's beach is. All they knew is, I'm getting out of the cold, and I'm coming to Florida, and I'm buying a beautiful house. And the houses in Reddington Beach on the water are very beautiful houses that cost a lot of money. And so they buy, and all of a sudden they see people in their backyard, which is their backyard. This town has never contended that their deeds show them owning to the mean high waterline. And in particular, one of the plaintiffs who testified at the trial had started to have substantial confrontations with town residents. And there were heated words, and there was calling of police. And so the town commission sees the statute coming, and it sees these conflicts in what had otherwise been, for decades, just a peaceful coexistence. And the testimony in the record coming out of trial is very clear on that point, that look, we didn't even realize this was private property. We just sort of assumed the seawall outward was public. But the new owners, asserting what they felt their property rights were, came out and said, get off my property. And one of them started setting up barriers and so forth. And so to answer your question, Judge, that was really the impetus of this ordinance, is that the commission came in and said, we really need to be able to do something here. And the Tony Ramachort, at page 78, said that the right of customary use of the dry sand of the beaches by the public does not create an interest in the land itself. Although this right cannot be revoked by the landowner, it is subject to appropriate governmental regulation. And so that's what the ordinance attempted to do, was to say, look, this is going on. We recognize, at least we commissioners think, that these residents of ours have acquired customary use of the dry sand. But we also see that these new owners are in town and they're having problems. So we're going to create this statutory scheme where we're only blessing a list of nine things. We're not blessing, you know, taking illegal drugs or setting up bonfires or anything else. We're nine very innocuous uses of the sand. We're banning certain other uses, which are a problem, like creating fires and setting up tents. And we're creating a buffer zone, which you could argue how deep the buffer zone was or whatnot, but that was what was created. The town, the plaintiffs lived in the town. They could have come to the two public hearings that were conducted by the commission in adopting the ordinance in accordance with Florida law. They didn't. Instead, they just chose to sue. And so that's where we're at. But in terms of the, you know, talking about the reasonableness of these regulations, if you look at the list of nine things, building sand castles, putting out a beach blanket or whatever, these are things that are typically occurring on a beach. So I understand if I come and I buy, spend $8 million or $20 million or whatever on a beautiful beachfront mansion, I would probably rather that no one be back there. But if those people gained that right, and I made this point to the prior panel, that the town didn't create this. It didn't impose. The people who use the beach are the ones who attained the right of customary use. The town's ordinance is trying to balance out, okay, these people have a right to use this sand. We have new owners that are coming in and are complaining about it. Let's figure out a way to try to create a regulatory scheme to where these folks can coexist together. And obviously nuisance law and all the rest of it still applies, correct? I mean, as you say, even things much more narrow than a nuisance would be barred. Absolutely. And I feel it was somewhat of a red herring throughout this litigation where the plaintiffs would say, oh, well, you know, the sheriffs won't come and respond. The sheriffs will come and respond. There's no—and the town, by the way, doesn't even control the Pinellas County Sheriff. It's a small Pinellas County beach town. The elected Pinellas County Sheriff of a county of a million people probably doesn't really care so much what the mayor of Reddington Beach has to say. So if that sheriff and his deputies get a phone call saying, this person is out here using illegal drugs, that deputy better respond. And I think my commission would want them to respond. If they don't respond, that's not my commission's fault. Take that up with the sheriff. On the issue of reasonableness, I assume that the private property owner would be liable if a member of the public comes onto what is their property and leaves broken glass and then somebody else is injured, digs a hole, somebody falls into it. I assume that liability would attach to the private property owner, correct? I don't know that that's a fair assumption. The law of negligence requires a duty, a breach of duty, to be proximate cause and damage. And so anyone who was injured by a piece of broken glass would have to prove all of those elements as against the homeowner. And the homeowner would put up defenses. And one of those defenses could be, well, unfortunately, because customary use applies to my backyard, I have other users that come out there. Someone apparently left broken glass. It's not my duty to patrol my backyard because I'm not the only user of it. So I don't think that that would be as automatic as you would suggest. Any questions? All right, well, I'll cede back my time. Thank you very much, Your Honors. All right, thank you, Mr. Eschenfelder. Mr. Weber, you've got three minutes. I do want to correct two things because they were in response to specific questions. This did fall out of the sky in a vacuum. There was no evidence of any of my clients or any other landowners on the beach having confrontations with people before the passage of this ordinance. The district courts explicitly so found that this ordinance was passed solely in response to House Bill 631 that said, if you're going to claim this as a municipality, you have to give people due process and sue them and get an adjudication that their land is subject to this. There was a carve-out, though. The carve-out was if anything that's already in existence before it goes into effect on July 1st then is not subject to this, you can use it as you can have an affirmative defense, right? Correct, correct. And we went through that in the prior case. But my point was this was a maneuver by the town so that they could be sued instead of have to sue in order to establish this sole reason. There was no evidence gathered by the town before doing this. And when you talked about two public hearings, my client did attend the second public hearing, had a lawyer there saying don't do this, you're taking my property without just compensation, asked the town, made a public records request, show me the evidence of customary use that underpins this ordinance, and they produced literally nothing. A couple people sitting on the beach at Beach Park and Zoe Roseman's house next door where people used to gather and watch the sunset. And so that was the pedigree of this ordinance declaring for the public at large to use all the property in the entire town. And that's the issue that we have in this case is that the town was never held to a burden of showing ancient. What is ancient here, 20 years they suggest? That can't possibly be under the English common law. This has got to be an ancient use that no one can remember. In fairness, they put on evidence, even though they put on live testimony from 56, witnesses from 56, they put on evidence which seemed to suggest that right from the beginning, Reddington Beach had a custom of allowing the public to use the beaches. You're right. The evidence in these easements are in evidence in this case are for the people to get to the, quote, waters of the Gulf of Mexico, the place where they're supposed to be, the place where if there's anything time immemorial, it's enshrined in our state constitution, our positive statutory law, and both our Spanish and English history that the demarcation between private and public ownership is mean high water. And those town accesses discussed in the very first meeting are to get down to the public trust land. And that was consistently confused in this case by the town showing uses of public spaces. Now we want the private. I did a little digging on time immemorial and found that Justinian the Great, in 531, said the rule that ordinary prescription shall be valid everywhere, whether it arises from possession for 10, 20, or 30 years, or even for a much longer time. Does that suggest perhaps that we don't need to look at the 1100s and find out what was going on in Florida at that point in order to understand whether we have customer usage here? I understand. And, you know, you can go through the whole pedigree of time immemorial, but the whole point was it had to go back to a point where no man could remember it otherwise. And here we have a record showing that these lots are platted down to mean high water with very specific purpose by a private land developer sold into private ownership. But even as far as I can tell, did you have any witnesses from 64 years ago or whatever the other witness was saying, we've always used this beach, did you have witnesses saying to the contrary we didn't?  In fact, our witness, Mr. Messmore, testified on day one. He's been in this area since 1951. He says this was a much different character of a beach. This was private, residential. When people went to the touristy places, it was in North Reddington. He lived on the beach for several decades in Reddington Beach and said people didn't go in my backyard. They would walk up and down by the water and they would go to the tourist facilities in North Reddington Beach. He'd been there longer than Mr. Scarr and been there his whole life. He was 80 years old and testified that since five years old, Reddington Beach was a quiet bedroom community, that it was purely residential. It wasn't even fun to go down to Reddington Beach because it was all quiet and residential. There was no one there. And so we put on decades of video and photographic evidence. The town presented zero corroboration from either videos, photos, documents, anything talking about the use of the plaintiff's land other than testimony of living oral witnesses, which can never be longer than legal memory. Thank you. Thank you very much, and we'll be in recess.